# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2203-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

E.S.,[1]

     Defendant-Appellant.

_____

Submitted October 17, 2024 – Decided December 11, 2024

Before Judges Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 15-10-1247.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Al Glimis, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the briefs; Catherine A. Foddai, Legal Assistant, on the briefs).

Appellant filed a pro se supplemental brief.

---

[1] We use initials to protect the victim's privacy. See R. 1:38-3(c)(9), (12).

PER CURIAM

Defendant, E.S., appeals from a Law Division order denying without an evidentiary hearing his petition for post-conviction relief (PCR) claiming ineffective assistance of his trial counsel. Defendant, convicted of multiple acts of aggravated sexual assault and related offenses, principally asserts that the PCR court erred in denying an evidentiary hearing regarding his trial counsel's failure to seek release pretrial of relevant Division of Child Protection and Permanency (Division) records, which included a medical report regarding the victim's physical examination at Audrey Hepburn Children's House (AHCH), and information concerning the victim's recanted allegation of sexual abuse against a different family member. He also claims counsel failed to investigate or call defense witnesses to testify at trial. Because defendant failed to establish a prima facie claim under Strickland v. Washington, 466 U.S. 668, 687 (1984), we affirm.

I.

We briefly set forth the pertinent facts and procedural history material to our determination derived from our prior decision on direct appeal, State v. E.S., No. A-3031-18 (App. Div. May 3, 2021) (slip op. at 4-18), and the trial and PCR motion records.

A-2203-22

Tried before a jury in 2018, defendant was convicted of three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); attempted aggravated sexual assault, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2(a)(1); three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). He is now serving an aggregate sentence of fifty years subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

A. The Offense

The charges followed then-twelve-year-old K.I.'s disclosure that defendant—her mother's fiancé—had been sexually abusing her since she was eleven. She alleged numerous acts of sexual contact and penetration by defendant spanning the course of a year.

Specifically, at trial, K.I. recounted the manner in which defendant repeatedly sexually assaulted her. K.I. testified with specificity that the abuse included defendant's licking and penetrating, both digitally and with his penis, her vagina, describing the circumstances of several distinct assaults. She explained that after enduring this abuse for roughly one year, she attempted to resist and stop the abuse, asking defendant to end the sexual conduct.

The trial evidence included corroborating photographs extracted from

both a device previously used by K.I. and on defendant's cell phone, which K.I. testified she "took . . . on defendant's phone in the hope that it would satiate him and stop him from further pursuing physical sexual abuse of her." E.S., slip op. at 8. As we described, "there were numerous photos of defendant and K.I. kissing on the lips, cheek, and touching tongues." Id. at 7. The phone also contained "salacious and inappropriate photos of [K.I.'s] bare breasts with her face in the picture." Ibid.

Incriminating text messages presented at trial demonstrated defendant pressuring K.I. to continue their sexual encounters. As we summarized:

> Eventually, however, on September 20, 2014, defendant gave K.I. (who was at that point twelve years old) a "deadline" for him to engage in sexual conduct with her. This communication was preserved in the following text exchange, which occurred at about 11:00 p.m. that day, while the two were home alone:
>
> [Defendant:] Hey babe, lets F***
>
> [K.I.:] I'm doing my nails. And delete that message.
>
> [Defendant:] I know you're doing your nails. I'm just asking can we F***
>
> [K.I.:] Oh yeah. Delete these messages.
>
> [Defendant:] Forget it. I'm going to kill myself tomorrow night.

[K.I.:]  No daddy.  Why, what did I do?  I said yeah.

[Defendant:]  Forget it.

[Id. at 10 (alterations in original) (footnote omitted).]

K.I. testified that an argument ensued between defendant and K.I., and the following day defendant continued his threats to kill himself.  K.I. continued to resist his advances.

These events led to K.I.'s disclosure of the abuse as we described:

[a]s their argument escalated, K.I. and defendant pushed each other.  Defendant threatened to kill himself with a switchblade he had previously shown to K.I., which was still in his pocket.  Despite that threat, K.I. still refused to allow defendant to engage in sexual conduct with her.  She demanded that he drive her to [her] grandmother's house down the street, fearing that he would commit suicide in front of her.  He drove her there.  As she got out of his vehicle, defendant told K.I. that "he was dead to [her]."

[Id. at 11 (alteration in original).]

Afterwards, K.I. told her grandmother she argued with defendant, and the two called K.I.'s mother, but K.I. only disclosed only that she argued with defendant who pushed her and told her he was going to kill himself.  K.I.'s mother then called defendant who admitted to pushing K.I. out the door.

5

The following day, K.I. disclosed the abuse to her step-grandmother who then contacted K.I.'s mother, indicating K.I. wished to speak with her.[2]  K.I. later revealed the abuse to her mother in the presence of her step-grandmother and maternal grandfather.  K.I.'s mother, wielding a baseball bat, confronted defendant, who did not admit to his conduct.

K.I.'s grandfather brought K.I. to the local police station, and both the Bergen County Prosecutor's Office (BCPO) and the Division responded.  While a BCPO detective interviewed K.I., the Division worker observed.  Additional officers proceeded to defendant's residence and found defendant "lying motionless on the bathroom floor . . . surrounded by empty pill bottles, two knives and a pair of scissors."  Id. at 16.  The officers provided defendant life-saving aid and retrieved his cell phone from the bathroom.

B.  Allegations Against Biological Father

Testimony revealed that during her forensic interview, K.I. alleged that her biological father touched her inappropriately when helping her shower, which she later recanted.  K.I. had previously disclosed this allegation to both defendant and K.I.'s mother in 2013, but "no action was taken [by K.I.'s mother] . . . because [K.I.'s biological father] no longer had contact with K.I.,"

_____

[2]  K.I.'s step-grandmother provided fresh complaint testimony at trial.

and he had only limited contact after she was around the age of four.  Id. at 8.

The BCPO referred K.I.'s allegation to Passaic County authorities, and K.I. explained that she now understood the difference between her father's touching her while bathing her as a young child and defendant's sexual behavior.  Defense counsel attacked K.I.'s credibility at trial, emphasizing during cross-examination and in closing arguments to the jury K.I.'s recanted claims as well as inconsistencies in her accounts of the timeline of defendant's assaults.

C.  AHCH Physical Examination of K.I. and the Motion for Mistrial

On cross-examination of K.I., defense counsel asked her about a text message she sent in the aftermath of her disclosure.  The text message stated that a doctor "told me I am a [virgin]."  Id. at 21 (alteration in original).  Specifically, defense counsel asked K.I.:  "Isn't it true that after you gave a statement to [the detective] saying that you engaged in sexual intercourse with a grown man on more than one occasion that you text messaged with your grandmother that a medical exam had found you to be a virgin?"  Ibid. (emphasis omitted).

After the State's objection and an immediate sidebar conference, defense counsel, outside of the jury's presence, read an earlier text from K.I., which

stated in pertinent part: "Well, I'll text you later or morning because we are in the doctor's office waiting. I'll text you or Mommy what happened." Defense counsel explained: "I don't think that I'm stretching anything to say that those two [text messages] are connected."

K.I. was questioned without the jury present and testified she went to "that doctor thing" and explained: "[T]hey checked like inside of me I guess and she had told me just because all of this happened I'm still a virgin, so that's what I went by." Ibid. Further questioning of K.I. without the jury present revealed K.I.'s doctor appointment had been at AHCH.

After hearing K.I.'s testimony, the court sustained the State's objection to further questioning of K.I. regarding the substance of her text message, finding that the testimony called for inadmissible hearsay,[3] and defense counsel

---

[3] We previously explained the court's ruling:

> The judge noted that defense counsel was "asking [K.I.] to repeat what the doctor said for the truth of the matter asserted that she's a virgin . . . . And you're arguing that physiologically she was a virgin . . . ." Further, the judge observed, "it's not at all clear exactly what it is that the doctor was telling her"—i.e., whether she was "physically" still a virgin or, alternatively, that she was still a virgin because the conduct was "non-consensual."
>
> [Id. at 22.]

indicated she reserved the right to call the doctor to testify.

It is undisputed that, until K.I.'s trial testimony, neither defense counsel nor the State knew that K.I. had been physically examined at AHCH. Id. at 20. The assistant prosecutor immediately obtained and provided the AHCH report completed by Paulett Diah, M.D., a child abuse pediatrician, to defense counsel and the court. Id. at 23.

We previously summarized the report in pertinent part as follows:

> The report included a detailed description of a genitourinary and anal examination of K.I. Among other things, it noted that K.I. was "unable to tolerate the use of a speculum." No hematomas, scars, lesions, lacerations, bruises, rashes, hypopigmentation, erythema, or ecchymoses were apparent.

> On the whole, the report described the findings repeatedly as "a normal examination." It expressly concluded that "[t]he result of this examination neither confirms nor denies the possibility of sexual abuse."

> In explaining why vaginal penetration could not be physically confirmed or ruled out, the report noted that K.I. was pubertal at the time. It elaborated that, at puberty, "estrogen effects on the genital tissues (which includes the hymen) result in tissue that is thickened, lubricated and elastic. These characteristics reduce the likelihood of injury from penetrating trauma." Hence, "a normal examination is not unusual in this setting." The report added that "superficial injury such as bruises or abrasions to the genitalia could have occurred at the time of the contact that may have now healed without residua."

9

[Id. at 25 (alteration in original).]

Thereafter, the trial court granted defense counsel a short recess to conduct research and subpoena Dr. Diah to testify at trial. Defense counsel thereafter filed a letter brief emphasizing, without expert support or medical information, the importance of the report stating K.I. "had an annular, or intact, hymen," and "was unable to tolerate use of the speculum during the exam." Id. at 26-27. Defense counsel argued this evidence was exculpatory and undermined K.I.'s accounts of repeated vaginal penetration by defendant. As Dr. Diah was unavailable and in line with defense counsel's request, the trial court granted a short continuance.

After Dr. Diah was again unable to testify due to illness, the trial court denied defendant's request for a mistrial. The trial judge ruled that "failure to explore this issue and obtain the records at issue fall[s] squarely at the feet of the defense." Id. at 28. The defense learned in discovery that a Division caseworker was present for K.I.'s statement, and K.I. sent a text that revealed she was seen by a doctor, indicating counsel could have filed a motion for those records. As we noted:

> The judge amplified this ruling by observing that he believed "the defense made a strategic decision as a matter of trial tactics to wait until cross-examination to surprise the witness and the State with this text

message." "It was plain that the [referenced] doctor's visit related to the allegations of sex abuse . . . but the defense chose not to explore that, instead, saving it for trial. Either way, the failure to obtain these records previously is the fault of the defense exclusively."

[Ibid. (alteration in original).]

Finding the report's contents were not exculpatory as the "examination neither confirm[ed] nor denie[d] the possibility of sexual abuse," the trial court determined the State did not withhold Brady[4] material or violate its discovery obligations. Id. at 29. The court further found the report alone without the accompanying testimony from Dr. Diah would risk the jury's incorrectly inferring "the doctor was telling [K.I.] that her allegations of sexual penetration were not true and that would have been wrong because that's absolutely not what the doctor conclude[s]." Ibid.

Thus, no further inquiry was permitted into the results of the examination or the AHCH report, and trial testimony concluded with the only mention of the AHCH visit occurring when the BCPO detective testified that he knew that K.I. had gone to the AHCH for evaluation after his forensic interview concluded.

We previously noted defense counsel's forceful closing argument casting K.I.'s testimony as fabricated:

---

[4] Brady v. Maryland, 373 U.S. 83 (1963).

11

In closing argument, defense counsel extensively questioned the credibility of K.I.'s accusations and her trial testimony. She argued that K.I.'s accusations were contrived, and that her narrative was replete with inconsistencies. Counsel argued that any sexual touching that had occurred was only by K.I.'s biological father, as K.I. had asserted to defendant. Counsel further argued that the photos and text messages, while seemingly alarming, were not conclusive proof beyond a reasonable doubt that defendant had actually engaged in any sexual conduct with K.I.

[Id. at 17.]

Prior to the trial court denying a mistrial, defense counsel took the consistent position that she was misled regarding the Division's involvement and had no obligation to request Division records that she believed did not exist. For example, she initially advised the trial court that she recalled asking a prosecutor previously assigned to the case whether "there [was] . . . ongoing [Division] involvement, because it's a very standard application in cases like this to do any, kind of, review," but did not request those records as she was given "indication . . . all in good faith . . . that although [the Division] was called to respond initially, they actually took no action."

Defense counsel also explained her belief that if she had filed a motion for K.I.'s medical records, she "would've been accused of a fishing expedition,"

as these motions must include a basis to "believe there might be . . . evidence relevant to the criminal case," necessitating production for in camera review.

Similarly, responding to the trial court's statement that defense counsel knew K.I. "went to the doctor," counsel claimed she assumed it was a private doctor and that the defense would not be permitted to obtain such records. She therefore explained she had only "a text message" and "all [she] wanted to do was ask [K.I. about] her knowledge of what [K.I.] sent in [her own] text." She intended to cross-examine K.I. about the text and "wanted that out there." She elaborated: "Once again, it is very much a defense strategy here to point out credibility issues, that she cannot be believed, that she says one thing one day, she says another thing the other day. I don't know what's true and what's not true."

Defense counsel also challenged the court's finding that the text was being offered for the truth of the matter asserted, representing that her intent before learning of the AHCH examination was instead to "simply to point out she says one thing, she says another. Who knows what to believe . . . ."

In arguing for a mistrial, defense counsel stated:

> I didn't know [K.I.] had this forensic examination. I had no reason to think that this doctor's appointment that she referenced was anything to do with the sexual allegations.

13

> My assessment of [K.I.] was that she was dishonest on several fronts and changed her version of events on several fronts and this text message about her being a virgin was just one of many inconsistencies. I had sexual intercourse. I'm a virgin. . . . I was just as shocked as anybody when [K.I.] was questioned about that [text] . . . and she said that she went to the [AHCH].
>
> . . . [I]f I knew that there was ongoing [Division] action, I could have [filed] a motion for in camera review.

Defense counsel further argued she relied on the representations of the BCPO and never suspected the text was about a Division-related medical examination, as it never occurred to her that the information provided to her by the State was incorrect.

D. Direct Appeal

On direct appeal, we considered and rejected defendant's claim that the State withheld material evidence in violation of its obligation to gather and provide exculpatory evidence under Brady, 373 U.S. at 83, or under the criminal discovery rules. See E.S., slip op. at 39-40. We also rejected defendant's claim that he was unfairly prejudiced by the late discovery of the AHCH report and, as such, improperly denied a mistrial. See id. at 40-41.

We "concurr[ed] with the trial judge that defense counsel had a fair

opportunity to seek the results of the evaluation herself." Id. at 40. We similarly agreed that the State committed no violation in failing to turn over the AHCH report that was not in its possession, but timely provided in 2015 K.I.'s text messages that alerted defendant to the possibility that K.I. visited a doctor. We noted, "perhaps for tactical reasons, defense counsel apparently elected to not pursue the subject until the cross-examination of K.I. in 2016." Ibid. "We d[id] not opine . . . about whether that was a reasonable tactical decision . . . ." Ibid.

We also expressly refrained from opining "whether it would have been preferable for the Prosecutor's Office to have initiated some inquiry on its own whether K.I. was taken by the Division to the AHCH for a medical examination and, if so, to find out the results of that examination." Id. at 41. We noted that the State might have "determined it had plenty of incriminating evidence (including the photos and text messages) so that it was not vital to pursue medical corroboration, or that, based on prior experience, such examinations at the AHCH are frequently, as here, inconclusive." Ibid.

E. PCR Proceedings

On November 1, 2021, defendant filed a timely pro se petition for PCR alleging trial counsel was ineffective for: (1) failing to investigate and present

the AHCH medical evidence; (2) failing to consult or present a medical expert to "challenge the theory that the complete lack of any physical evidence was consistent with the allegations presented"; and (3) failing to "call witnesses favorable to the defense." Defendant provided no accompanying affidavits, sworn or unsworn statements, or additional information.

PCR counsel filed an amended petition in September 2022 referencing defendant's pro se petition and asserting only "ineffective assistance of counsel for counsel['s] failure to properly investigate the case pre-trial and through sentencing," with a supporting letter brief but no affidavits or information. The brief alleged trial counsel failed to investigate K.I.'s "similar allegation in Passaic County against her biological father"; to investigate or call two potential defense witnesses, C.S. and M.P., allegedly with knowledge of relevant texts from K.I.; and to investigate or call as a witness Dr. Diah to testify as to the negative examination results.

The PCR court heard oral argument on defendant's petition in January 2023. PCR counsel argued that trial counsel failed to obtain Division records relevant to K.I.'s allegations against defendant, in particular, the AHCH medical report, and similar allegations against her father. PCR counsel relied heavily on the trial court's findings and our references on direct appeal regarding trial

counsel's obligation to pursue Division records and counsel's likely strategic decision not to file a motion to obtain those records. PCR counsel stated that "we don't know how it would have affected the outcome of this case," but argued Dr. Diah's findings and testimony was "something that should have been . . . front and center in this case." As to the failure to call the two potential defense witnesses, defendant alleged trial counsel failed to investigate what the witnesses might have said had they been interviewed or called to testify.

The State argued that: K.I.'s statements to law enforcement in Passaic regarding her allegations against her biological father were provided to defendant in pretrial discovery and any claim that the Division's file would contain material information was speculation; trial counsel vigorously cross-examined on K.I.'s recanted allegation against her father; defendant failed to show the two potential defense witnesses would provide admissible information relevant to the defense other than hearsay regarding texts they received which were otherwise admitted; defendant failed to show how calling Dr. Diah at trial would have changed the result in light of her clear opinion that the absence of physical indicia of trauma is not abnormal and proof of nothing; and the trial evidence against defendant was overwhelming.

The PCR court issued an order and accompanying written decision on

February 9, 2023, denying defendant's petition without a hearing. It found defendant "did not establish a prima facie claim that a hearing [wa]s required" as "[t]he transcripts of the trial did not elucidate any issues that could not have been determined through the submitted certifications and briefs."

Considering defendant's main contention on appeal that his trial counsel was ineffective for failing to seek Division records, particularly Dr. Diah's medical report in preparation for trial, the PCR court found defendant "fail[ed] to demonstrate that [t]rial [c]ounsel's chosen strategy f[ell] outside the range of legal competency."

Regarding the AHCH report, the PCR court determined "[i]t is unequivocal [t]rial [c]ounsel was aware of and ultimately had access to Dr. Diah's report as noted by [this court on direct appeal]. Nevertheless, even if Dr. Diah were to take the stand, her testimony would likely [be] comprise[d of] only her report." The PCR court was thus "unconvinced had [t]rial [c]ounsel successfully attained Dr. Diah as a witness, her testimony would have significantly altered the results of the trial."

Considering defendant's claims regarding trial counsel's failure to interview and call C.S. and M.P as witnesses, the court again found defendant "fail[ed] to demonstrate that [t]rial [c]ounsel's refusal to call any witnesses

constitute[d] professional error." It noted "there [were] no certified statements or other documentary evidence proving the witness[es] . . . could provide meaningful testimony to shed a different light on the defense." Moreover, it found "no reasonable probability that [defendant]'s outcome would have been different." Thus, the PCR court found defendant failed to establish a prima facie case of ineffective assistance of counsel.

This appeal followed.

II.

Defendant raises the following arguments on appeal:

POINT I

THE PCR COURT IMPROPERLY DENIED DEFENDANT'S CLAIM THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WITHOUT AFFORDING HIM AN EVIDENTIARY HEARING.

A. Legal Principles Regarding Claims of Ineffective Assistance of Counsel, Evidentiary Hearings and Petitions for [PCR].

B. The PCR Court Erred by Failing to Address and Consider Factual Findings by the Trial Court and the Statements of Trial Counsel Regarding Trial Counsel's Performance, Instead Issuing a two Paragraph Conclusory Statement Denying Relief.

Defendant raises the following additional points in his supplemental pro

se brief:[5]

POINT I

THE DEFENSE FAILED TO ARGUE THE FACT
THAT THE PROSECUTOR HAD KNOWLEDGE
THAT K.I. WAS SENT TO HAVE A FORENSIC
EXAM AT . . . [AHCH] AND WITHHELD THE
RESULTS WHICH IS A BRADY VIOLATION.
BRADY v. MARYLAND, 373 U.S. 83 (1963).

A. THE DEFENSE COUNSEL FAILED TO ARGUE
THE FACT THAT AN EXAM WAS DONE ON K.I.
WHICH WAS NOT MENTIONED UNTIL ALMOST
THE END OF TRIAL.

B. THE RESULTS OF THE EXAM WERE NOT
MENTIONED AND WERE NOT ALLOWED TO BE
MENTIONED TO THE JURY BY EITHER PARTY
AFTER A DIRECT ORDER BY [THE] TRIAL
JUDGE . . . DURING SIDEBAR.

C. THE TRIAL JUDGE . . . STATES THAT HE
LAYS THIS COMPLETELY AT THE FEET OF

---

[5] Defendant's supplemental submission consists only of point headings with no substantive legal or factual arguments. As such, we need not address these cursory assertions. See, e.g., In re Bloomingdale Convalescent Ctr., 233 N.J. Super. 46, 48 n.1 (App. Div. 1989) (dismissing an appeal that was not properly briefed); see also Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (treating such a failure to brief an argument as a waiver). We note only that the issues as stated appear either procedurally barred as they were or should have been raised on direct appeal, see R. 3:22-4, -5; sufficiently addressed by counsel's brief on defendant's behalf; or lacking sufficient merit to warrant consideration, see R. 2:11-3(e)(2).

TRIAL COUNSEL FOR FAILURE TO INVESTIGATE AND GET THE INFORMATION THAT COULD HAVE BEEN USED TO HELP [DEFENDANT] IN HIS CASE.

D. THE DEFENSE COUNSEL FAILED TO ARGUE THAT ON PAGE [THIRTY-TWO] OF THE APPELLATE DECISION, THE APPELLATE COURT SAYS THAT THEY ASSUME THAT THE A[HCH] AND MEDICAL REPORT CONTAINS MATERIAL INFORMATION WHICH COULD HAVE BEEN FAVORABLE TO THE DEFENSE IMPEACHING THE VICTIM'S NARRATIVE.

POINT II

THE DEFENSE COUNSEL FAILED TO PRESENT EVIDENCE BEING HELD BY [TWO] WITNESSES.

A. THE DEFENSE COUNSEL FAILED TO ARGUE THE FACT THAT THERE WERE [TWO] WITNESSES AVAILABLE IN COURT WITH EVIDENCE ABOUT K.I. HAVING TOLD HER MOTHER, [J.R.], THAT [DEFENDANT] DID NOT ABUSE HER SEXUALLY, ONLY MENTALLY, WHICH WERE [M.P.] THE DEFENDANT'S SISTER AND [C.S.], THE DEFENDANT'S DAUGHTER.

B. THE PROSECUTOR . . . CLAIMS THAT THE CELL[ ]PHONE MESSAGES THAT THE DEFENDANT'S SISTER [M.P.] AND THE DEFENDANT'S DAUGHTER, [C.S.], RECEIVED FROM K.I.'S MOTHER MONTHS APART IS ONLY HEARSAY.

C. THE DEFENSE COUNSEL FAILED TO INVESTIGATE AND INTERVIEW THE [TWO]

21

WITNESSES AND SECURE THE MESSAGES FROM THE CELL PHONES.

D. THIS ALL VIOLATED DEFENDANT'S [SIXTH] AMENDMENT COMPULSORY CLAUSE WHICH WOULD HA[VE] GIVEN HIM THE CHANCE TO OFFER THE TESTIMONY OF FAVORABLE WITNESSES AND WOULD HA[VE] COMPELLED THEIR ATTENDANCE AT TRIAL.

POINT III

THE DEFENSE COUNSEL FAILED TO INVESTIGATE AND PROPERLY PREPARE FOR TRIAL TO INCLUDE ALL RELEVANT EVIDENCE IN THIS CASE.

A. THE DEFENSE COUNSEL DELIVERED A SUBPOENA FOR DR. DIAH TO APPEAR IN COURT AND GIVE TESTIMONY REGARDING HER REPORT ON OCTOBER 10, 2018 BUT THE DEFENSE COUNSEL HAD BEEN NOTIFIED BY THE [AHCH] LEGAL DEPARTMENT ON OCTOBER 5, 2018 THAT DR. DIAH WAS OUT OF THE COUNTRY UNTIL OCTOBER 15, 2018. THE DEFENSE COUNSEL DID NOT HAVE ENOUGH TIME TO INVESTIGATE KEY EVIDENCE [UNDER] NEW JERSEY COURT RULE 3:13-3(f).

B. THE DEFENSE COUNSEL'S ERRORS AND FAILURES LED TO A DEFINITE MISCARRIAGE OF JUSTICE AND [DEFENDANT] WAS DENIED THE CHANCE TO PRESENT EVIDENCE AND TO HIRE A PROFESSIONAL WITNESS TO LOOK AT AND TESTIFY AS TO THEIR CONCLUSION. HOW COULD THIS BE CALLED JUSTICE? HOWARD V. WALKER, 406 F.3D 114 (2D. CIR. 2005).

22

III.

In the absence of an evidentiary hearing, we review factual findings and legal conclusions de novo. See State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016). To prevail on PCR applications, defendants must show by a preponderance of the evidence they are entitled to relief. See State v. Preciose, 129 N.J. 451, 459 (1992). To sustain that burden, the defendant must allege and articulate specific facts that "provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992).

The Sixth Amendment of the United States Constitution guarantees the criminally accused the effective assistance of legal counsel. Strickland, 466 U.S. at 687. To establish a deprivation of that right, a convicted defendant must satisfy the two-part test enunciated in Strickland demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Ibid.; see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-part test in New Jersey). Failure to establish either prong requires the denial of a PCR petition founded on an ineffective assistance of counsel claim. See Strickland, 466 U.S. at 700.

The first requirement concerns "whether counsel's conduct fell below an objective standard of reasonableness." State v. Savage, 120 N.J. 594, 614

23

(1990) (citing Strickland, 466 U.S. at 688). "[A] defendant challenging assistance of counsel must demonstrate that counsel's actions were beyond the 'wide range of professionally competent assistance.'" Ibid. (quoting Strickland, 466 U.S. at 690). PCR applications must overcome a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

"[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy." Fritz, 105 N.J. at 54 (citation omitted); see also State v. Echols, 199 N.J. 344, 358 (2009). "Nevertheless, 'strategy decisions made after less than complete investigation are subject to closer scrutiny," State v. Chew, 179 N.J. 186, 205 (2004) (quoting Savage, 120 N.J. at 617-18), and we review with particular deference strategic decisions by trial counsel regarding whether to call particular witnesses at trial, see State v. Arthur, 184 N.J. 307, 321 (2005).

"[T]o satisfy the second prong—that a defendant has been prejudiced by counsel's actions—there must be a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

24

the outcome.'"  Savage, 120 N.J. at 614 (quoting Strickland, 466 U.S. at 694).

Ultimately, "[a]n error by counsel, even if professionally unreasonable, does

not warrant setting aside the judgment of a criminal proceeding if [it] had no

effect on the judgment." Strickland, 466 U.S. at 691.  Under Strickland's second

requirement, a defendant must also show "counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Errors with "some conceivable effect on the outcome" fall short of warranting

relief. Id. at 693.

Further, "[a]ny factual assertion that provides the predicate for a claim of

relief must be made by an affidavit or certification pursuant to Rule 1:4-4 and

based upon personal knowledge of the declarant before the court may grant an

evidentiary hearing." R. 3:22-10(c); see State v. Cummings, 321 N.J. Super.

154, 170 (App. Div. 1999).  "[B]ald assertions" are simply insufficient to

support a PCR application. Ibid.; see also R. 3:22-10(b); State v. Porter, 216

N.J. 343, 354-55 (2013) (reaffirming these principles in evaluating which of a

defendant's various PCR claims warrant an evidentiary hearing).

To establish a prima facie case of ineffective assistance warranting an

evidentiary hearing, "the defendant must demonstrate a reasonable likelihood

that his or her claim will ultimately succeed on the merits." State v. Marshall,

148 N.J. 89, 158 (1997) (citing <u>Preciose</u>, 129 N.J. at 463).  The mere raising of a claim for PCR does not entitle the defendant to an evidentiary hearing.  <u>See</u> <u>Cummings</u>, 321 N.J. Super. at 170.  Rather, "[i]f the court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to [PCR], . . . then an evidentiary hearing need not be granted." <u>Marshall</u>, 148 N.J. at 158 (citations omitted).

IV.

Against this well-settled legal backdrop, we have considered and reject defendant's claims after affording the favorable inferences to which he is entitled.

We need not remand for an evidentiary hearing.  First, as to the claims that defense counsel failed to investigate or call C.S. or M.P as witnesses, who apparently received text messages from K.I., we concur with the PCR court's finding that defendant failed to proffer any information signaling what these witnesses might have said and how their testimony would have altered the outcome.  We likewise conclude the claims concerning defense counsel's failure to obtain Division records regarding the investigation into K.I.'s recanted claims against her biological father, and counsel's not calling him to testify at trial, suffer the same infirmity.  Defendant offers no support or further

26

explanation regarding how the father's testimony would be preferable to K.I.'s own admission that she made and later recanted the accusation.

Regarding the claims associated with the failure to obtain Division records and Dr. Diah's report directly related to K.I.'s allegations against defendant, it is not necessary that we determine the degree of any deficiency in counsel's representation. Instead, we accept for purposes of our consideration defendant's assertions that trial counsel did not seek to obtain Division records related to K.I.'s allegations against defendant. We similarly assume that defendant would have called Dr. Diah to testify at trial.

Even allowing defendant these assumptions, we need not opine whether counsel's performance fell below the standard of reasonable trial strategy because we are satisfied that defendant did not demonstrate any alleged deficiency was sufficiently prejudicial under Strickland's second requirement. See State v. Gaitan, 209 N.J. 339, 350 (2012) ("Although a demonstration of prejudice constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced" (citing Strickland, 466 U.S. at 697)).

We recognize that on appeal defendant argues that if the information had been obtained pretrial defense counsel would have called Dr. Diah or consulted

another expert to challenge Dr. Diah's determination. Importantly, however, defendant provides no information revealing how Dr. Diah's opinion was incorrect or vulnerable to challenge. Defendant has not offered any support for his claim that the doctor's testimony or that of another unnamed medical expert would have changed the outcome. Strickland's second requirement cannot rest on speculation or conjecture. See State v. Maldon, 422 N.J. Super. 475, 486 (App. Div. 2011).

We concur with the PCR court that Dr. Diah's report clearly stated her opinion that the absence of residual visible injury or physical evidence of penetration was "not unusual." The doctor expressly explained that the "normal examination" of K.I., given her actual and developmental age, "neither confirms nor denies the possibility of sexual abuse." Defendant made no proffer as to what the medical or Division records would have revealed, or what outcome-altering impact would have probably resulted from Dr. Diah's testifying that, although there was no indicia of injury, that finding is normal for children at K.I.'s age and stage of development and neither proves nor disproves her allegations. As the PCR court stated, we are "unconvinced had [t]rial [c]ounsel successfully attained Dr. Diah as a witness, her testimony would have significantly altered the trial."

We are similarly unpersuaded by defendant's unsupported claims of prejudice resulting from defense counsel's failure to further investigate K.I.'s recanted claims regarding abuse by her biological father, including the Division's records. The trial record is replete with unrefuted references to these recanted allegations, elicited on cross-examination of police witnesses, K.I., K.I.'s mother, and her step-grandmother. Throughout opening and closing arguments, defense counsel relentlessly emphasized these false claims by K.I. to undermine the veracity of her allegations against defendant. Any claim that unknown records would have provided additional information that would probably have changed the result is conjecture.

To determine the probability that absent these alleged deficiencies in counsel's performance the outcome of the trial would have been different requires consideration of the weight of the evidence as a whole. This was not a case that rested solely on K.I.'s testimony. Her testimony was detailed and compelling, but did not stand alone.

The record included photographs and text messages corroborating K.I.'s claims. Photographs were found on defendant's phone showing K.I. topless and depicting the two kissing and touching tongues, and text messages were produced from defendant to K.I. stating "Let's F***" and threatening to kill

29

himself. This evidence supported K.I.'s testimony regarding what had occurred and her attempts to end the sexual abuse. In addition, police found defendant after attempting to take his life when confronted with K.I.'s allegations. The nature and weight of the trial evidence undermines defendant's unsupported arguments that the outcome would have been different had trial counsel called a doctor to say the medical examination understandably revealed no helpful evidence to determine whether the abuse occurred or called witnesses whose potential testimony remains unknown.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2203-22